**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALICIA MCDANIEL,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE BRYN MAWR TRUST COMPANY,** | : | **No. 19-2419** |
| **Defendant.** | : | |

<u>**MEMORANDUM**</u>

Schiller, J.                                                                                   October 27, 2022

Plaintiff Alicia McDaniel began working at Defendant The Bryn Mawr Trust Company (the "Bank") in 2016 and remains an employee there. Throughout her time at the Bank, she raised several incidents of discrimination and harassment to her manager and HR. She then sued the Bank for employment discrimination, retaliation, and hostile work environment under applicable federal and state law. The Bank filed a motion for summary judgment on all claims. For the reasons that follow, the Bank's motion is granted in full.

## I.    <u>BACKGROUND</u>

Alicia McDaniel is an African American woman originally hired by the Bank as a part-time teller at its Ardmore location in December 2016. (*See* Def.'s Statement of Undisputed Material Facts [Def.'s SUMF] ¶ 1; Pl.'s Statement of Disputed Facts [Pl.'s SDF] ¶ 1.) The Bank promoted her twice, first to a full-time position of Universal Banker I and then promoted to Universal Banker II, a position she still holds at the Bank. (*See* Def.'s SUMF ¶¶ 2, 5; Pl.'s SDF ¶¶ 2, 5.) McDaniel also received a pay raise for both promotions. (*See* McDaniel Dep. at 491:4-23.)

### A.    <u>Incidents at the Ardmore Branch</u>

Shortly after McDaniel began working at the Bank, she overheard a white customer tell a white employee "that there were a lot of [B]lack faces" in the branch. (McDaniel Dep. at 15:22-

1

16:12, 20:4-16.) McDaniel testified that this customer also declined her assistance when he visited the branch and instead preferred to be assisted by white employees. (*See id.* at 16:15-17:8, 18:11-15.) McDaniel reported this to her supervisor, Danielle Llewellyn-Perez, who discouraged McDaniel from formally reporting this incident to HR. (*See id.* at 20:17-24, 22:12-19.) McDaniel stated that Llewellyn-Perez told McDaniel she submitted a complaint to HR, but Llewellyn-Perez did not actually do so.[1] (*See id.* at 22:12-23:17, 488:8-14.)

McDaniel also testified that during a call on or after January 29, 2018, Maria Delimitros, who worked as a recruiter, asked her "how is Laura Biernacki," an individual the Bank had recently hired as a Market Area Manager. (*Id.* at 199:24-200:24; *see also id.* at 201:6-202:10.) McDaniel stated she "explained to [Delimitros] the things that [she'd] witnessed and supposedly experienced," but the subject quickly changed. (*Id.* at 199:24-200:15.)[2]

### i. July 2018 Corrective Action Notice and subsequent actions

On July 12, 2018, Llewellyn-Perez and Biernacki met with McDaniel and provided her with a "Corrective Action Notice." (Def.'s Ex. 112 at 1; *see also* Def.'s SUMF ¶ 18.) The Notice began by informing McDaniel that her recent "behavior in the workplace has been unacceptable." (Def.'s Ex. 112 at 1.) It explained that "[m]anagement has sensed tension and poor rapport between [McDaniel and her] co-worker[s] in the past and [her] inability to put the organization's needs first in line with the duties and responsibilities of [her] role is unacceptable." (*Id.*) Specifically, on June

---

[1]     The Bank points out that by not reporting this incident directly to HR, McDaniel failed to comply with its Employee Handbook's requirement to "immediately report" any discriminatory, harassing, or retaliatory conduct "to Human Resources." (McDaniel Dep. at 21:1-24:15; *see also* Def.'s Ex. 18 at 10.) When McDaniel was asked to specify when she brought certain complaints directly to HR, McDaniel explained that by "speaking to [her] manager," who "said she would escalate it to HR," she "considered that following the chain of command to get to HR." (McDaniel Dep. at 203:17-23.)

[2]     *See infra* n.4.

8, 2018, McDaniel "refused to provide" certain information a Regional Manager requested. (*Id.*) While tracking down that information from McDaniel's colleagues, the Regional Manager learned that McDaniel "left the branch without notifying [her] co-worker and remained out of the branch for approximately 15 minutes." (*Id.*) This "created a situation where proper service levels would not be delivered to [the Bank's] customers." (*Id.*) On another occasion, McDaniel failed to sufficiently answer questions from Stephen Novak (Director of Retail), who was investigating a customer complaint.[3] (*Id.*) The Notice urged McDaniel to correct her "unacceptable" behavior and reminded her to "respect everyone on [her] team and cooperate for the best interest of our branch and company." (*Id.* at 2.) McDaniel refused to sign the Notice despite a disclaimer that signing the document did "not necessarily indicate that [she] agree[d]" with its contents. (*Id.*)

McDaniel was scheduled to have a meeting the next morning with Nicola Fryer and Gina Marandola-Tincu (who both worked in HR) to discuss the Notice. (*See* Def.'s Ex. 115.) During the meeting, McDaniel stated that she feared Biernacki, as did her colleagues.[4] (*See* Def.'s Ex. 119

---

[3]    That investigation focused on a March 2018 incident involving McDaniel and her co-worker Magdaline Intzes. In a May 2018 email, McDaniel explained that she was assisting a customer when Intzes "abruptly transferred" another customer to her. (Def.'s Ex. 97 at 2.) Intzes was helping that customer file a Power of Attorney on behalf of his wife. (*Id.*) Intzes "was late for an appointment at her daughter's school and . . . she could no longer assist the customer," so she transferred the customer to McDaniel. (*Id.*) McDaniel wrote that this "was not a warm transfer. [McDaniel] did not have background information regarding this sensitive matter" and the customer became "agitated." (*Id.*) However, McDaniel was ultimately able to assist the customer with help from Llewellyn-Perez. (*See id.*) In an email response, Novak asked why McDaniel "thr[e]w [Intzes] under the bus" and told McDaniel she should raise any issues she had with Intzes with Llewellyn-Perez. (*Id.* at 1.) McDaniel forwarded this email chain to her personal email because she felt she "was being harassed" and "intimidate[ed]" and "needed to have this as proof of our e-mail exchange." (McDaniel Dep. at 121:19-122:2, 123:11-14.)

[4]    The record is not clear why McDaniel so strongly feared Biernacki from virtually the outset of Biernacki's time at the Bank, but the record is replete with instances reflecting McDaniel's feelings towards Biernacki. McDaniel testified that Biernacki was "a bully" and "racially discriminatory." (McDaniel Dep. at 156:12-19.) She stated that she had observed Biernacki exhibiting favoritism to white employees at another branch and that Biernacki was perceived as coming "down particularly hard on African-Americans who did not meet" performance metrics,

at 2.) She also stated she believed Biernacki forced Llewellyn-Perez to issue the Notice because Llewellyn-Perez seemed nervous during the meeting and regularly commended McDaniel's performance. (*See id.*) McDaniel also claimed that she had previously been forced to work after clocking out and she had not received proper credit for a loan she opened for a customer. (*See id.*) Additionally, she complained it was hard to work with Intzes. (*See id.*) Finally, McDaniel asked to be transferred out of Biernacki's geographic market or transferred to a "back office" job. (*See id.*)

In response, Fryer explained Llewellyn-Perez chose to issue the Notice as a means of addressing McDaniel's recent behavior. (*See id.*) Fryer stated she would investigate possible job openings, told McDaniel she could have the day off, and asked McDaniel to send her information regarding when she was told to work after clocking out. (*See id.* at 3.) In an email sent shortly after the meeting, McDaniel thanked Fryer and Marandola-Tincu for meeting with her and acknowledged being given the rest of the day off.[5] (*See id.*; *see also* Def.'s Ex. 118 at 4-5.)

---

including sales goals. (McDaniel Dep. at 159:18-160:10, 188:2-9.) McDaniel believed Biernacki "created an environment of fear when she walked into a branch" and that through her emails and phone calls, "she sets [the] tone of a dictator." (McDaniel Dep. at 189:5-13.) She also said Llewellyn-Perez told her that Biernacki was "racially rude" and that Biernacki was "evil," which Llewellyn-Perez disputed. (McDaniel Dep. at 106:4-107:15; Def.'s Ex. 119 at 2, 8.) McDaniel thought that Biernacki "was going to try her best to run [McDaniel] out of Bryn Mawr Trust." (McDaniel Dep. at 156:5-11.) When Biernacki asked McDaniel about her sales success, McDaniel believed that it was actually an implicit accusation "that an African-American woman can't meet [a] goal, can't be great at [her] job; [she] can't be better at [her] job. And there must be something wrong with – or there must be something that [the Bank doesn't] know that you're doing or to insinuate that [McDaniel was] . . . misleading customers into products." (McDaniel Dep. at 196:12-23.)

[5]     Later that day, Fryer and Marandola-Tincu met with Llewellyn-Perez to discuss McDaniel's Notice and the allegations McDaniel made in their subsequent meeting. (*See* Def.'s Ex. 119 at 7.) Llewellyn-Perez refuted McDaniel's claim that Biernacki forced her to issue the Notice. (*See id.* at 7-8.) In fact, Llewellyn-Perez stated that she had previously raised some of the issues in the Notice informally with McDaniel. (*See id.* at 7.) She also agreed with McDaniel that McDaniel should have been awarded credit for a loan that she helped open. (*See id.*) Finally,

4

That evening, Marandola-Tincu and McDaniel spoke on the phone. (*See* McDaniel Dep. at 132:15-133:4; Def.'s Ex. 116.) According to Marandola-Tincu's notes, she explained to McDaniel she might be able to work as a temporary analyst with the Bank Secrecy Act (BSA) Team. (*See* Def.'s Ex. 116.) The position was expected to last three to six months and "could lead to [full-time]" employment. (*Id.*) McDaniel responded positively to this opportunity and Marandola-Tincu stated she would follow-up with McDaniel. (*Id.*)

On Saturday, July 14, 2018, McDaniel wrote down twelve "Points of Discussion" in response to her meetings with HR. (*See* Def.'s Ex. 117.) In the list, McDaniel disputed the Notice's contents of the Notice and asserted various forms of mistreatment, including "Hostile Environment 'Environment of Fear,'" "Retaliation", and "Witness of Harassment." (*Id.*) McDaniel testified she wrote these notes to "document [her] experiences." (McDaniel Dep. at 182:6-14.)

On Monday, July 16, 2018, Fryer emailed McDaniel to inform her that she set up a meeting for McDaniel with the BSA Team so McDaniel could "learn more about" a possible role with the team and "share [her] education, background and experience." (Def.'s Ex. 118 at 2.) McDaniel met with the BSA Team the next day, expressed continued interest in the role, and asked Fryer a

---

Llewellyn-Perez vehemently denied McDaniel's allegation that she or anyone else at the branch was forced to work after clocking out. (*See id.* at 8.)

Llewellyn-Perez also explained that Intzes offended McDaniel soon after they first started working together. (*See id.*) Intzes allegedly disparaged McDaniel for working full-time rather than staying home to raise her children. (*See id.*) Llewellyn-Perez believed that McDaniel continued to hold a grudge against Intzes as a result. (*See id.*) McDaniel testified that Intzes called her a "bad mother" for working rather than staying home to raise her children. (McDaniel Dep. at 105:4-21.) McDaniel stated Intzes, who was Greek, "made comments that her culture was superior and . . . she just didn't understand how . . . [B]lack women would allow our children to be home. She made comments about [B]lack fathers. How we don't as [B]lack women allow our [B]lack men to rule the house and to be the leaders of their house." (*Id.*) According to McDaniel, she and Llewellyn-Perez discussed these comments and Llewellyn-Perez told McDaniel to ignore them. (*Id.* at 106:4-107:15) Llewellyn-Perez also allegedly told McDaniel that HR was aware of Intzes's remarks. (*Id.*)

series of logistical questions about transitioning to the position following the meeting. (*See id.* at 1-2.) Fryer suggested they meet on July 18 to discuss McDaniel's questions. (*See id.* at 1.) During that meeting, Fryer and Marandola-Tincu explained that the BSA role was not currently intended to be a full-time position. (*See* Def.'s Ex. 119 at 4.) They suggested exploring a position at the Media branch instead. (*See id.*) McDaniel was open to that possibility and reiterated her desire to remain a full-time employee. (*Id.* at 4, 6)

Fryer and Marandola-Tincu also informed McDaniel that they were unable to corroborate McDaniel's allegation that Biernacki forced Llewellyn-Perez to issue the Corrective Action Notice. (*Id.*) McDaniel continued to push back against this. (*Id.* at 4.) Similarly, Fryer and Marandola-Tincu explained that after speaking with McDaniel's Ardmore colleagues, they were not able to verify her allegation that employees were forced to work after clocking out. (*Id.* at 4-5.) However, they asked McDaniel to provide details of the specific dates when she alleged this occurred. (*Id.* at 5-6.)

McDaniel then informed Fryer and Marandola-Tincu that on June 6, 2018, she had emailed Llewellyn-Perez regarding another dispute she had with Intzes. (*See* Def.'s Ex. 119 at 5.) McDaniel explained that while the staff was closing the branch, Intzes "became confrontational." (Def.'s Ex. 120.) McDaniel believed the "Branch environment ha[d] become toxic and uncomfortable" due to Intzes's "hostility towards" McDaniel and other team members. (Def.'s Ex. 120.) Fryer and Marandola-Tincu said Llewellyn-Perez did not previously alert them to this incident. (*See* Def.'s Ex. 119 at 5.) Upon investigation, however, the Bank reviewed video footage of this purported incident and found there was "no altercation." (Def.'s Ex. 120.)

After Fryer, Marandola-Tincu, and McDaniel concluded their July 18 meeting, Fryer formally notified McDaniel that the Bank would not be able to transition her to a full-time position

with the BSA Team. (*See* Def.'s Ex. 121.) To accommodate her wishes to avoid working under Biernacki's purview, however, Fryer told McDaniel to report to the Bank's Media branch for work the next day. (*See id.*) She explained that McDaniel would continue serving in her same role and at her same rate of pay. (*See id.*) Fryer concluded by stating that she did "not believe this [would] be a permanent move and" reassured McDaniel that the Bank was "still working on finding you a new home." (*Id.*)

### B.  <u>Transition to Media</u>

On August 3, 2018, McDaniel filed a charge with the EEOC. (Def.'s SUMF ¶ 62; Pl.'s SDF in Opp. ¶ 62.)

On August 6, while still working at the Media branch, McDaniel informed Fryer and other members of HR that her timecard needed to be adjusted. She explained that "[d]ue to [her] change of schedule, she was "one [hour] short of 40 hours for the week." (Def.'s Ex. 144 at 6.) McDaniel was "accustomed to working 40+ hours per week," but once she began working in Media, she was only working "38 or 39 hours per week. To reach 40 hours, [she] would have to work every Saturday of the month, which is not fair to [her] and [was] never discussed with [her] ahead of time." (*Id.* at 3.)

Fryer explained that "the company does not provide adjustments for time not worked" and quoted the Bank's policy, which provides that "[t]he daily working schedule for [Bank] employees varies according to the branch office or department in which they work." (*Id.* at 4.) However, Fryer stated the Bank was "willing in this one instance to pay you for the hour requested since [McDaniel

did] not appear to have been clear about the policy." (*Id.*) In the future, however, the Bank would not make any adjustments for hours not worked.[6] (*See id.*)

In response, McDaniel expressed various concerns she had. (*See id.* at 2-4.) First, she explained that prior attempts to "follow[] the chain of command . . . to report [her] concerns of a hostile and racially toxic work environment" were futile. (*Id.* at 2-3.) With respect to her temporary transfer to Media, McDaniel stated that her supervisors "were completely unprepared for [her] arrival and stay" at the branch and her Regional Manager "has not [been] able to see [her] timecard, discuss sales/goals or provide coaching." (*Id.* at 3.) McDaniel did not believe she had "been properly supported. The entire staff in Media has asked [her] uncomfortable questions pertaining to the reason for [her] switch and how long [she] will work in the [b]ranch." (*Id.*) McDaniel also asserted that Media's new Branch Manager, Frantz Excellent, told her that she "was officially being transitioned to the Media Branch" even though she "was not informed about the switch." (*Id.*) McDaniel was frustrated by this, since working in Media was intended to be "only a temporary transition." (*Id.*) She alleged she was "being penalized financially, mentally, ethically and morally for following protocol." (*Id.*)

On August 16, 2018, Fryer responded that the Bank "fully investigated [her] concerns and [was] unable to agree with [her] recount of the matter." (*Id.* at 1.) Fryer also disputed other aspects

---

[6]     McDaniel also sought to be reimbursed for extra mileage she drove by commuting to Media rather than Ardmore. (*See* Def.'s Ex. 147 at 2.) The Bank did not believe McDaniel was entitled to this reimbursement under its policy regarding reimbursing expenses. (*See* Def.'s Ex. 202 at 2-3.) However, as it did with respect to McDaniel's claim for being underpaid by an hour, the Bank made an exception and awarded McDaniel mileage expenses retroactively (to the date she raised this issue) because McDaniel appeared to be mistaken regarding the policy. (*See* Def.'s Ex. 202 at 2-3.) The Bank also explained that McDaniel would not be entitled to future mileage reimbursements because those costs did not fall within the Bank's limited circumstances for which mileage can be reimbursed. (*See* Def.'s Ex. 202 at 2-3.) McDaniel alleged this was retaliatory because she had previously been reimbursed when covering a different branch. (*See id.* at 1; McDaniel Dep. at 232:19-233:6.)

of McDaniel's claims, including with respect to the company's policy for employees' working hours. (*See id.*) Finally, Fryer assured McDaniel that the Bank would "have information regarding [her] future work location by the end of next week." (*Id.*)

On August 27, 2018—just over a month after McDaniel began working in Media—McDaniel met with Fryer and Lindsay Saling (VP for Retail Strategy) to discuss a permanent position at another branch location. (*See* Def.'s Ex. 147.) Saling informed McDaniel there were full-time openings for Universal Bankers at three branches: Phoenixville, Aston, and Northern Liberties. (*See id.* at 1.) Saling also stated McDaniel "would be scheduled 40 hours" at any of these locations. (*Id.*) When McDaniel asked about prospects for a promotion at each branch, Fryer and Saling explained that each branch could "support a promotion internally," but noted that McDaniel's prior Corrective Action Notice "would be considered and may lessen her ability to" be promoted. (*Id.* at 1-2.)

McDaniel then asked questions regarding her sales goals. She asserted she was on track to meet her goals and asked how a transfer would affect those benchmarks. (*See id.* at 2.) Fryer stated McDaniel's goals would be based on the new branch, as each location has different standards based on its "size, volume, market share[, and] opportunity as well as the number of [full-time employees] in that branch." (*Id.*) McDaniel was concerned about moving to a new branch because she believed she was "starting over" and she did not transition smoothly at Media. (*Id.*) Fryer and Saling both assured her that other employees had successfully transferred branch locations in the past and that a transfer can often be a conversation-starter with clients. (*See id.*) Following the meeting, Saling sent McDaniel each potential new branch address and asked McDaniel to make a decision by the end of the week. (*See id.* at 3.) McDaniel confirmed she would do so shortly thereafter. (*See* Def.'s Ex. 148.)

On Friday, August 31, McDaniel emailed Fryer and stated that none of the three branches offered to her were "feasible options." (Def.'s Ex. 151 at 2.) McDaniel did "not want to start over a third time" and instead wanted "to work at my Home Branch, Ardmore." (*Id.*) McDaniel alleged "HR has turned a deaf ear to my concerns and subjected me to more retaliation." (*Id.*) She claimed that this suggested move was in "retaliation to my filing with the EEOC." (*Id.*) She again asserted that Media's new Branch Manager, Excellent, told her she was becoming a permanent employee of the Media branch despite Fryer's assurances to the contrary. (*See id.*)

Fryer responded that the Bank did "not agree with all of the facts as [McDaniel had] depicted" them but wanted "to provide clarity regarding [McDaniel's] branch assignment and [her] discussion with Frantz Excellent." (*Id.* at 1.) Fryer explained that Excellent was mistaken that McDaniel was to become a permanent employee at Media. (*See id.*) Further, Fryer acknowledged McDaniel's request to return to Ardmore "and will work toward that goal." (*Id.*) Because that "may take some time," Fryer asked McDaniel to "please continue to work in the Media branch." (*Id.*) Finally, Fryer reminded McDaniel that any concerns or complaints, including those related to retaliation, should be directed to HR or the Bank's General Counsel. (*See id.*)

### i.  **McDaniel's Complaint Regarding a Phone Call**

In September 2018, McDaniel sent an email to Excellent with the subject line "Harassment and Racial Discrimination Claims." (Def.'s Ex. 155.) McDaniel wrote that she had "a major concern" because Biernacki was "on the phone line with" two Media employees and was "grilling them about what [McDaniel is] doing on the Teller Line." (*Id.*) McDaniel said she was "extremely uncomfortable with the harassment and racial discrimination" and claimed this was "all done in retaliation to my filing with HR and the EEOC." (*Id.*) Excellent reached out to Biernacki to schedule a meeting to discuss these allegations. (*See* Def.'s Ex. 156 at 2.) McDaniel later

10

forwarded Excellent's message to Frank Leto, the Bank's CEO, to inform him of the harassment and retaliation she claimed she suffered. (*See* Def.'s Ex. 157.) Shortly thereafter, Marandola-Tincu and another HR representative arranged to visit the Media branch. Over the course of the next two days, they interviewed McDaniel and six other employees across multiple branches to investigate her allegations. (*See* Def.'s Exs. 158, 161.)

McDaniel's interview lasted only four minutes because she refused to discuss the events without her lawyer. (*See* Def.'s Ex. 161 at 3.) McDaniel testified that she had "already had several meetings with HR and it was very redundant. They had already known [her] requests and [her] complaints," so she did not feel the need to talk to HR about this incident, even though she had never discussed the phone call in question with HR. (McDaniel Dep. at 337:7-338:8.)

In investigative interviews with other Bank employees, the Bank learned that Biernacki called the Media branch because its employees had not yet made certain customer outreach calls. (*See* Def.'s Ex. 161 at 4, 11.) According to one employee, Biernacki asked whether McDaniel "was making calls," but Biernacki was not "grilling" her, as McDaniel claimed in her email to Excellent. (Def.'s Ex. 161 at 4.) The two employees who actually spoke to Biernacki both described the calls as "professional" in tone but noted that the calls were upsetting because they were already overwhelmed and felt belittled. (*See* Def.'s Ex. 161 at 4-6, 18.)

After speaking with seven employees related to this incident, the Bank did not find support for McDaniel's allegations.[7] (*See* Def.'s Ex. 161 at 28-29.) However, because multiple employees reported that Biernacki was a harsh manager, the investigation recommended that she "receive

---

[7]     An employee at the Media branch stated that he overheard Biernacki state that the tellers at Media were "incompetent" roughly a week before this incident. (Def.'s Ex. 161 at 24.) He interpreted that comment to be racial "because the two tellers behind the line are African-American and he associated incompetent with lazy." (*Id.*) No other employee interviewed claimed Biernacki made any comments regarding race.

training and coaching on her communication" and management skills. (*Id.* at 29.) It also explicitly noted that "it is not advisable to have [Biernacki] manage a branch where Alicia McDaniel works." (*Id.*). Accordingly, the report suggested the Bank consider "realigning Market Managers." (*Id.* at 29.)

## ii. **Sales Goals and Performance Review Issues**

During her first quarter at Media, McDaniel did not "make" scorecard[8] and therefore did not receive a bonus. (*See* Def.'s SUMF ¶ 110; Pl.'s SDF ¶ 110.) At McDaniel's request, Excellent reached out to his superiors to see if her scorecard could be adjusted to reflect her recent branch transition. (*See* Def.'s SUMF ¶ 111; Pl.'s SDF ¶ 111; *see also* Def.'s Ex. 168 at 1.) During the subsequent review of McDaniel's goals, Excellent "did not indicate that the sales goals were not set properly or unreasonabl[y] as they are in alignment with the other two bankers in the office. [Excellent] confirmed that the goal was attainable based on [McDaniel's] past performance, the activity at the Media branch and the performance of the other staff members." (Def.'s Ex. 168 at 2.) Accordingly, the Bank declined to retroactively adjust McDaniel's goals and she did not receive a bonus.[9] (*See id.* at 3.)

In March 2019, McDaniel emailed HR to express her "dissatisf[action] with [her] annual performance review." (Def.'s Ex. 189 at 3.) McDaniel claimed that Biernacki "altered [her]

---

[8]     A scorecard is a set of quarterly sales goals an employee must meet to qualify to receive a bonus. (*See* Def.'s SUMF ¶ 108.)

[9]     The Court also notes that McDaniel did not raise issues regarding her sales or performance goals when she met with Fryer and Saling in August 2018. (*See* Def.'s Ex. 147.) In fact, McDaniel asserted that she was on track to meet her sales goals at that time. (*See id.* at 2.) The Court also notes that in September 2018, McDaniel helped Excellent draft an email to Biernacki and Saling regarding McDaniel's salary and sales goals. (*See* Def.'s Ex. 153.) In response, Fryer explained that McDaniel's salary did not need to be adjusted and her sales goals were "in line with overall goals, objectives and opportunity" at Media. (Def.'s Ex. 154 at 2.)

scorecard results as a retaliation tactic to use against [her]." (*Id.*) McDaniel testified that she believed Biernacki altered her scorecard because she was "given . . . higher goals with the intention that [she] would not meet the goals." (McDaniel Dep. at 316:14-17.) She asserted that Biernacki "scrutinized and dissected" her original review until her manager "succumbed to the criticism and submitted 'bland and blanket' comments" with inferior scores.[10] (Def.'s Ex. 189 at 3.) According to McDaniel, this was a result of McDaniel's "report of racial discrimination to senior management, HR & [her] subsequent filing with the EEOC. [She has] been subjected to a hostile work environment" and she believed her sales quotas were unjustifiably increased after transitioning to Media. (*Id.*) Finally, McDaniel protested the Bank's practice of imposing sales quotas and "the relentless pressure to obtain new sales," which she asserted "has had and will continue to perpetuate fraudulent actions" and "booking fraudulent revenues." (*Id.*)

An HR representative responded to McDaniel's concerns and explained that "HR has initiated an investigation" into whether Biernacki altered McDaniel's scorecard. (*Id.* at 1.) With respect to her allegations of fraud, the Bank reminded McDaniel that she has "an affirmative obligation under [the Bank's Ethics Code] to tell HR, Risk or Legal about it immediately so that it can be investigated and appropriate action can be taken." (*Id.* at 2.) The Bank assured McDaniel that it "takes this allegation very seriously . . . and it is imperative that if you know of misconduct, you provide details as soon as possible so that the issue can be dealt with." (*Id.*) Finally, the Bank acknowledged that its employees face sales pressure because the Bank is "a business and absent

---

[10]     According to Excellent, when he sent McDaniel's annual review to Bienacki to be finalized, she questioned whether it was accurate. (Excellent Dep. at 42:5-43:8, 233:23-234:2.) Specifically, after Excellent gave McDaniel scores of five out of five, Biernacki told Excellent that even the Bank's CEO "does not have a five rating." (*Id.* at 43:9-45:16.) Excellent stated he "acquiesced" and reduced McDaniel's scores to a four. (*Id.*)

sales, [the Bank] would not exist. But in no instance would [the Bank] ever expect or pressure employees to engage in fraudulent activity." (*Id.*)

On April 24, 2019, McDaniel emailed Sanchez, Leto, and two HR representatives to complain of additional retaliation by Biernacki. (*See* Def.'s Ex. 199 at 4-5.) McDaniel alleged Biernacki accused her of "gaming" by impermissibly splitting credit for a loan, "falsifying a credit card sale," and more broadly claimed the Bank "allow[ed] unqualified individuals to partake in the mortgage" and loan origination process in "noncompliance with the law." (*Id.* at 5.) Corey Crapella (from HR) reached out later that day and set up a meeting to discuss McDaniel's allegations with her. (*Id.* at 4.) The two met on May 1 and McDaniel stated she would "be submitting supporting documents" in support of her claims. (Def.'s Ex. 201 at 1.)

Crapella sent a summary of his investigation's findings on June 3, 2019, which largely refuted McDaniel's allegations. (*See* Def.'s Ex. 217.) First, Crapella noted that Biernacki did not directly accuse McDaniel of "gaming," but rather raised a concern to Excellent that certain employee scorecards were suspicious. (*Id.* at 1.) The Bank's policy states that "[o]nly one person qualifies" to receive origination credit "for any sale." (*Id.*) Despite this, McDaniel and another employee "agreed to split the credit [for a $300,000 loan] 50/50" in February 2019. (Def.'s Ex. 188.) However, because the other employee was $75,000 shy "of meeting her Q1 booked loan goal," McDaniel agreed "to relinquish $75,000 of [her] credit and give it to" her colleague. (*Id.*)[11]

With respect to the accusation regarding falsifying a credit card sale, Crapella found that a report Biernacki viewed summarizing the branch's sales did not reflect a sale McDaniel made. (*See* Def.'s Ex. 217 at 2.) When Biernacki raised this with Excellent, he explained the discrepancy,

---

[11]      When the Bank learned of this arrangement in May 2019, the Bank made an exception to its policy, but explained that future splits would not be permitted. (*See* Def.'s Ex. 217 at 1; *see also* McDaniel Dep. at 366:18-368:5.)

which was due to a reporting error. (*See id.*) Finally, Crapella noted that "all new hires responsible for taking loan applications" receive Loan Product Training and supplementary online modules. (*Id.* at 2.) McDaniel completed the initial training in May 2018 and Crapella reminded her that she could re-take the course if she desired. (*Id.*)

### iii. <u>Communications Regarding George Floyd and Racial Diversity</u>

On June 10, 2020, Leto, sent a firm-wide email regarding "the tragic events that unfolded throughout our country during the last few weeks, including the death of George Floyd." (Def.'s Ex. 242 at 1.) The email noted the Bank's goal of "build[ing] a culture of inclusivity" that "celebrate[d] that [the Bank is] a company with people of many races, religions, national origins, disabilities, gender identities, sexual orientations, incomes, backgrounds and more." (*Id.*) Nine days later, Leto sent another email acknowledging Juneteenth and reaffirming the Bank's commitment to diversity and inclusion. (*Id.* at 3.)

On July 8, 2020, McDaniel emailed Leto, Sanchez, and the Bank's Board of Directors in response to Leto's emails. (*See* Def.'s Ex. 242 at 4-6.) McDaniel believed Leto's "email addressing George Floyd's murder was very cliché and spurious." (*Id.* at 4.) She also criticized the Bank for purporting to celebrate equality and diversity even though it faced allegations of discrimination from several employees. (*See id.*) McDaniel reiterated that she believes she has "been retaliated against by Laura Biernacki".[12] and "invit[ed]" the Bank to meet with her "and/or the other plaintiffs to discuss a positive solution" with their lawyers. (*Id.* at 5.)

---

[12]     McDaniel's email also raised new allegations against Biernacki, including that she used "racial slurs" and that she demanded that McDaniel's manager give her a written warnings due to unscheduled PTO days. (Def.'s Ex. 242 at 4-5.) The Bank determined that McDaniel's allegation of the use of racial slurs was "unfounded." (Def.'s Ex. 277 at 1.) It also concluded that, although Biernacki sought to issue McDaniel "a warning due to attendance," it was not supported by her manager or HR. (*Id.*) McDaniel never received a written warning. (*See* Def.'s Ex. 242 at 7.)

In response, Sanchez explained that the Bank viewed McDaniel's email as a demand for settlement, which she "presume[d] was written by your lawyer for you to send." (*Id.* at 7.) Sanchez reiterated that any issues McDaniel had should be raised with HR rather than the Bank's executives and Board of Directors. (*See id.* at 7-8.) Finally, she informed McDaniel that the Bank would be conducting "focus group sessions . . . geared towards addressing global rather than individual concerns" and suggested McDaniel "let Jerry know" if she wanted to join a session. (*Id.* at 8.) McDaniel responded and said Sanchez "totally dismissed" the intent of her note by focusing on settlement of her claims. (*Id.* at 10.) She also took offense at the suggestion that her lawyer helped prepare the letter[13] and criticized the HR Department for "shuffl[ing] around or overlook[ing]" her complaints. (*Id.*) McDaniel never reached out to sign up for the Bank's focus group sessions because she believed participants had already been chosen. (*See* McDaniel Dep. at 615:17-618:7.)

## C.  Procedural History

McDaniel filed a complaint with the EEOC and Pennsylvania Human Relations Commission (PHRC) on August 3, 2018. (Def.'s SUMF ¶ 62; Pl.'s SDF in Opp. ¶ 62.) The EEOC issued a Right to Sue Letter on March 7, 2019. (Compl. ¶ 9.) This lawsuit was filed within 90 days of the Right to Sue Letter and is therefore timely.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material

---

[13]    McDaniel supplemented her original EEOC charge against the Bank based on this allegation. (*See* Def.'s Ex. 245.) McDaniel's charge stated that she was "incensed" by Leto's emails regarding diversity given "the fact that six lawsuits are pending over racism" against the Bank. (*Id.*) She alleged Sanchez's response was a "racist accusation that [her] letter was written by [her] lawyer, a white ma[le] and that [she] could not write what [she] did." (*Id.*)

facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the non-moving party may demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994); *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   <u>DISCUSSION</u>

McDaniel sued the Bank for racial discrimination, retaliation, and hostile work environment under federal and state law. The Bank seeks summary judgment on all counts. Because McDaniel failed to proffer sufficient evidence on which a jury could reasonably find for her on any of her claims, the Court grants the Bank's motion in full.

**A.  Racial Discrimination**

McDaniel's racial discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework.[14] "To establish a *prima facie* case, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she suffered a materially adverse employment action; and (4) the circumstances of the adverse employment action support an inference of discrimination." *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114, 125 (E.D. Pa. 2022) (citing *Whitmore v. Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020)) (italicization added); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). If a plaintiff establishes a *prima facie* case, the employer must offer legitimate, non-discriminatory reasons for the adverse employment action. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

If the employer provides non-discriminatory reasons for its actions, the plaintiff must then prove that the employer's "explanation is merely a pretext for the discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). The plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.*

---

[14]     McDaniel asserts racial discrimination claims under 42 U.S.C. § 1981, Title VII, and the Pennsylvania Human Relations Act (PHRA). The same burden-shifting framework applies to claims brought under each statute. *See Blakney v. City of Phila.*, 559 F. App'x 183, 187 (3d Cir. 2014); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020).

(quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). In doing so, the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

The parties do not dispute that McDaniel is a member of a protected class and the Court will assume she was qualified for the position she held. However, she is unable to establish a *prima facie* case because she has not shown she suffered an adverse employment action.

An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). It "must constitute 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Anderson v. Mercer Cnty. Sheriff Dep't*, 815 F. App'x 664, 666 (3d Cir. 2020) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

McDaniel argues that "[t]he treatment that [she] was forced to endure at Bryn Mawr Trust, particularly at the hand of Ms. Intzes and Ms. Biernacki," constitutes an adverse employment action. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Pl.'s Opp.] at 14.) But "Title VII and section 1981 . . . do not provide relief for general unpleasantness that can occur in the workplace, even if that unpleasantness may be motivated by racial animus." *Barnes v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d Cir. 2015). The Court does not doubt that McDaniel was offended or upset by the incidents she endured. Nor does the Court mean to diminish how these

experiences affected her. But the conduct she objects to is not redressable under discrimination laws absent an adverse employment action.[15] *See Raffaele v. Potter*, No. 09-3622, 2012 WL 33035, at \*3-4 (E.D. Pa. Jan. 6, 2012) (rejecting plaintiff's argument that an "employee can be subject to an adverse employment action even if not subject to one of the 'traditional' actions (i.e., firing, failing to hire, failing to promote, reassignment, or a significant change in benefits), so long as the employer's actions affect the terms of conditions of employment"); *see also Barnes*, 598 F. App'x at 91 ("Bullying or discrimination of any kind in the workplace is wrong, but not every wrong is a violation of federal law.").

McDaniel's lateral transfer to the Media branch is also not an adverse employment action. "Employment actions such as lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions." *Stewart v. Union Cnty. Bd. of Educ.*, 655 F. App'x 151, 157 (3d Cir. 2016). A transfer may be an adverse employment action if the employee's new position "is inferior to, rather than merely different from," her prior position. *Langley v. Merck & Co., Inc.*, 186 F. App'x 258, 261 (3d Cir. 2006). But here, McDaniel's position, title, duties, and pay remained the same when she began working in Media. (*See* Def.'s SUMF ¶ 57; Pl.'s SDF ¶ 57; Def.'s Ex. 121.) Although McDaniel had to learn a new clientele and felt as if she was "starting over," her role at the Media branch was not "inferior to" her role at Ardmore. *Langley*, 186 F. App'x at 261. Her transfer was therefore not "a significant change in her employment status" that can be used to establish a *prima facie* case. *Anderson*, 815 F. App'x

---

[15]     Furthermore, rather than singling out McDaniel or targeting her due to her race, the record reflects that Biernacki's conduct was a result of her management style, which appears to have been demanding, critical, and at times overbearing. (*See, e.g.*, Def.'s Ex. 161 at 4-6, 18, 28-29; Excellent Dep. at 232:20-233:7.)

at 667 (affirming grant of summary judgment because plaintiff's transfer to different facility with no significant change in responsibilities was not an adverse employment action).

Finally, the Corrective Action Notice and annual review McDaniel objected to are not adverse employment actions. "Disciplinary action or harsh speech that does not materially change the terms or conditions of employment cannot lay the foundation for a claim of employment discrimination." *Johnson v. Independence Blue Cross*, No. 09-4239, 2013 WL 1874954, at *12 (E.D. Pa. May 3, 2013). Like McDaniel's transfer to Media, these events did not affect her responsibilities or pay, and McDaniel offers no other evidence establishing that these incidents otherwise affected the terms or conditions of her employment. *See Friel v. Mnuchin*, 474 F. Supp. 3d 673, 686 (E.D. Pa. 2020) (rejecting plaintiff's argument that negative performance evaluation affected terms and conditions of employment); *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 410-11 (E.D. Pa. Feb. 25, 2014) (rejecting plaintiff's argument that verbal and written warnings constituted adverse employment actions). Accordingly, they cannot constitute adverse actions for purposes of a *prima facie* case.

The Bank is therefore entitled to summary judgment on McDaniel's race discrimination claims.

### B.  Retaliation

Retaliation claims under Title VII and the PHRA are also subject to the *McDonnell-Douglas* burden shifting framework. *See Anderson v. Boeing Co.*, 694 F. App'x 84, 85-86 (3d Cir. 2017). To establish a *prima facie* case of retaliation, a plaintiff must show "that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting

*Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). In the retaliation context, an adverse employment action must be "materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Swain v. City of Vineland*, 457 F. App'x 107, 111 (3d Cir. 2012) (noting that "[a] broader definition of adverse action" applies to retaliation claims than discrimination claims). To assess whether protected activity and retaliatory conduct are causally connected, a court may analyze "the temporal proximity between the two if 'unusually suggestive,'" or in the alternative, "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

Once a plaintiff has established a *prima facie* case, the employer must provide "'a legitimate, non-retaliatory reason' for its conduct." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)). The plaintiff may rebut this explanation by showing the employer's reasons for its conduct are pretextual. *Id.* "[T]he plaintiff must produce 'sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action.'" *Krouse*, 126 F.3d at 504 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)). To cast enough doubt onto the employer's proffered reasons, a plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy

of credence.'" *Whitmore*, 510 F. Supp. 3d at 309 (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007)).

McDaniel argues that once she began reporting instances of purported discrimination, she was retaliated against "right away." (McDaniel Dep. at 234:11-16.) She asserts her character has been tarnished, her career has been disrupted, and she is unable to advance at the Bank. (Pl.'s Opp. at 5-6.) Her claim fails, however, because she cannot show the Bank took an adverse employment action as a result of her protected activity.

McDaniel testified that she believes "some of [her] colleagues are afraid to work with [her] because of the lies that were told about" her. (McDaniel Dep. at 481:17-25.) This, at most, amounts to a "petty slight[]" or "minor annoyance[]" that is not a materially adverse action. *Clarkson v. Se. Pa. Transp. Auth.*, No. 14-2510, 2016 WL 1637279, at *9 (E.D. Pa. Apr. 25, 2016) (finding "workplace gossip . . . not [a] materially adverse action[]" for purposes of retaliation claim). Nor did McDaniel suffer financial loss "or any change to the terms of" her employment as a result of her protected activity. *Morrison v. Carpenter Tech. Corp.*, 193 F. App'x 148, 154 (3d Cir. 2006). And her "subjective belief that her career" has been disrupted does not constitute an adverse employment action. *See Nagle v. RMA, The Risk Mgmt. Ass'n*, 513 F. Supp. 2d 383, 391 (E.D. Pa. 2007) (granting summary judgment on retaliation claims where "Plaintiff has not pointed to any injury or harm she suffered other than her own subjective belief that her career with [defendant] was over"). In fact, contrary to McDaniel's argument that her career has been thwarted since speaking out against this conduct, she has remained employed at the Bank and was promoted after filing this lawsuit. (Def.'s SUMF ¶¶ 2-3; Pl.'s SDF ¶¶ 2-3.)

Since McDaniel has failed to establish a *prima facie* case for her retaliation claims, the Court will grant summary judgment for the Bank.

**C.**  **Hostile Work Environment**

"To establish a hostile work environment claim," McDaniel must show: "(1) that she suffered intentional discrimination because of her race . . . ; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances[;] and (5) the existence of *respondeat superior* liability."[16] *Davis*, 2022 WL 970842, at \*5 (citing *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 310 (3d Cir. 2018)). A hostile work environment exists when a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To determine whether such an environment exists, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (quoting *Harris*, 510 U.S. at 23).

McDaniel broadly asserts that "the manner in which Ms. Biernacki and Bryn Mawr Trust have acted towards [her] amounts to intentional discrimination" sufficient to survive the Bank's motion for summary judgment. (Pl.'s Opp. at 18.) The Court disagrees.

---

[16]     McDaniel's hostile work environment claims under Title VII and the PHRA "are subject to the same legal standard, so the Court will analyze them together." *Davis v. Elwyn, Inc.*, No. 20-5798, 2022 WL 970842, at \*5 (E.D. Pa. Mar. 31, 2022) (citing *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006)).

During her tenure at the Bank, McDaniel made numerous allegations of discrimination and harassment, which the Bank consistently investigated and found to be meritless. *See generally supra* Section I. Even though McDaniel experienced these events as racially discriminatory, to establish a hostile work environment, the plaintiff must show conditions are "objectively hostile, not just hostile in the plaintiff's view." *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (citing *Harris*, 510 U.S. at 21). Many of these incidents were isolated or "offhand comments that are insufficient to support a hostile work environment claim." *Woodard v. PHB Die Casting*, 255 F. App'x 608, 609-10 (3d Cir. 2007); *see also Whitmore*, 510 F. Supp. 3d at 309 (finding "isolated incidents . . . insufficient to show that the challenged conduct was 'severe or pervasive'"). Even those that are clearly objectionable, such as Intzes's comments and disparaging remarks, are not "so severe or pervasive as to constitute an objective change in the conditions of employment." *Lawrence v. F.C. Kerbeck & Sons*, 134 F. App'x 570, 572 (3d Cir. 2005). In any event, the conduct was "not particularly frequent" and was "not physically threatening or humiliating." *Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 777 (3d Cir. 2009). "Although [McDaniel] may subjectively believe that her treatment was discriminatory, she has not presented a genuine issue of fact to overcome summary judgment with respect to her hostile work environment claim." *Hanzer v. Nat'l Mentor Healthcare, LLC*, No. 12-363, 2014 WL 1390889, at *4 (D. Del. Apr. 10, 2014). Accordingly, the Bank's motion will be granted.

## IV.   <u>CONCLUSION</u>

For the reasons discussed above, the Court grants the Bank's motion for summary judgment as to all claims.

An Order consistent with this Memorandum will be docketed separately.